UNITED STATES of America,
Plaintiff-Appellee,

v.

Leonard Edward JOHNSON, Defendant-
Appellant.

No. 27841.

United States Court of Appeals,
Fifth Circuit.

June 17, 1970.

Darryl J. Tschirn, New Orleans, La.,
(court-appointed) for defendant-appel-
lant.

Gerald J. Gallinghouse, U. S. Atty.,
New Orleans, La., Geo. P. Hand, Jr.,
Asst. U. S. Atty., for plaintiff-appellee.

Before THORNBERRY, COLEMAN, and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge.

A jury convicted this appellant, Leonard Edward Johnson, of the armed robbery of a New Orleans bank in violation of 18 U.S.C.A. § 2113(a) (d).[1] He was sentenced to imprisonment for twenty five years, to run concurrently with any other federal sentence. The evidence adduced at the trial does not support the conviction. We reverse, with directions that the indictment be dismissed.

The robbery occurred November 29, 1967. Two men walked into the bank. They were dark and were wearing dark (or black) glasses, T-shirts, pants, and be-bop hats. They weighed between 150 and 160 pounds. The one who later exhibited a weapon wore black and white saddle oxfords.

The robbery was witnessed by the bank manager, the assistant manager, two female employees of the bank, and another man not otherwise identified.

One of the robbers stood at the desk in the front lobby. The other went to a teller's window, occupied by Mrs. Lucy Adkinson. He told Mrs. Adkinson, "this is a stick-up." He pulled a short barrelled gun from his belt, handed her a paper bag, and told her to deliver over all the money in the drawer at which she worked. He also warned Mrs. Adkinson not to push any buttons. When she finished emptying the drawer the robber instructed her to "open it wide" so he could see that there was nothing left. The haul amounted to $8,600.

Two months later, armed with a search warrant which was not made a part of the record below, agents of the Federal Bureau of Investigation searched Leo-

nard Edward Johnson's apartment in New Orleans, where they found a dark colored .22 pistol, a pair of black and white saddle oxfords, and a black be-bop hat.

At the trial below, the prosecution offered only Mrs. Adkinson as an eye-witness to the crime. She had previously viewed a collection of photographs at the police department, after which she witnessed a six man line-up. Although called by the government, she testified that she had never positively identified the defendant in either the pictures or at the line-up. Upon confronting Johnson in the court room, she stated four times that she could not positively identify him as the robber. The questions and answers went in this fashion:

"Q. You are not positive that he is the man?

"A. No, sir. I couldn't be positive.

"Q. Likewise you are not positive that that is the gun?

"A. No, sir."

Again she was asked, "Can you now positively identify him"?

"A. I could not be sure, no, sir.

"Q. Under oath today before the jury can you identify the defendant as being the person that robbed you?

"A. I cannot positively identify him."

Yet, the Assistant United States Attorney in his brief for the Government, states, at page 8 of the brief, "In the instant case, the defendant was identified by the victim teller, Mrs. Lucy Adkinson, as being the individual who robbed her on November 29, 1967." At another point, page 6, the brief writer states, "The evidence identifying the defendant

1. Section 2113. Bank Robbery and Incidental crimes.
    (a) Whoever, by force or violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association; or

    (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

as one of the bank robbers was overwhelming." Quite obviously, these assertions are not supported by the record. The most that Mrs. Adkinson ever said, after viewing the pictures and witnessing the line-up, was that Johnson "looked more like the man who robbed her than any of the others.'

The prosecution intended to bridge the gap with the testimony of one Frank Edward West, a narcotics addict. He had been returned from prison in California on a writ of habeas corpus ad testificandum. Pending the trial he was lodged in the St. Bernard Parish jail. Shortly before the trial was to begin, West attempted to commit suicide by hanging. He was cut down in time to save his life. Before making the suicidal attempt, he had left a note which said, "To Whom It May Concern, I, Frank E. West, lied on Leonard Johnson. I cannot go through with this." This language was followed by instructions as to the disposition of his body.

It was the Government's position that West had informed the F.B.I. in December, 1967, of a conversation with the defendant in which Johnson stated that he committed the robbery.

When West was brought into Court he refused to testify until he could consult with his attorney. He stated that he feared his testimony would cause him to be indicted for perjury. The trial judge very wisely stopped the proceedings until the lawyer could be sent for and a conference held. After the conference, West decided to take the stand.

Before he began his testimony, the prosecutor announced, "This witness is going to testify as a hostile witness to the Government, and we will proceed to impeach his testimony."

West's testimony runs from page 125 to 174 of the in forma pauperis transcript. It would be hard to imagine a more incoherent, disjointed, rambling recitation than that delivered by this witness. In sum, he denied that Johnson had ever admitted the bank robbery in his presence. He claimed that he worked

for the F.B.I. as an informer under "coercion and suppression (sic)." It was later developed that West was himself under suspicion of bank robbery at the time he first contacted the F.B.I.

In any event, the prosecutor asserted that West's testimony took him by surprise and, on that basis, he was allowed both to cross-examine and impeach him. Of course, the defense objected.

Up to a point West had merely denied statements which inculpated Johnson. Under questions from defense counsel he began to divulge information which, if believed, would clear Johnson entirely. West repudiated his March 20, 1969, statement, alleging that he had gotten an armed robbery charge reduced to simple robbery if he would testify against Johnson. Finally, West swore that he had originally incriminated Johnson in order to prevent being charged himself with robbery.

Over the objection of defense counsel, the prosecution was allowed to impeach West with the testimony of F.B.I. Agent Paul Hensel. Mr. Hensel testified that West called the F.B.I. on November 29, 1967, that he knew West at the time was a suspect in another bank robbery. Hensel finally met West on December 4. West had been communicating under the name of F-15. West met Hensel and Special Agent Davis at the corner of Claiborne and Toledano. At that time West told the agents that the robbers were Leonard Johnson and another individual by the name of Levi (last name unknown). He was paid $10 for his information. He thereafter contacted the F.B.I. office almost daily. He ultimately gave the agents a written statement that Johnson had admitted the robbery.

The agent was with the Assistant United States Attorney when they talked to West in the St. Bernard Parish jail on Thursday prior to the trial. West was extremely nervous, indicating that he had been receiving methadone in the Los Angeles County jail and also talouin. After the interview the officers arranged for West to have some more talouin for his

nervous condition. The drug was left with the jailer and given as prescribed. Mr. Hensel said that West was fearful on Thursday but announced that he would testify for the Government. He said that West claimed to be afraid that Johnson would kill him.

Upon completion of Agent Hensel's testimony the prosecution rested.

The defense then moved for a directed verdict on the ground that "the government had failed to prove any identification in regard to the defendant, Leonard Edward Johnson * * * the government failed to carry its burden in regard to the identification of this defendant, Leonard Edward Johnson. Accordingly, because of that lack of evidence, a directed verdict should follow."

The prosecution responded that Mrs. Adkinson had picked Johnson out of the line-up "as being the individual who most closely resembled the man who robbed her on November 29, 1967." That the .22 pistol had a barrel that looked like the one the robber used and that a pair of black and white saddle oxfords and a black be-bop cap were seized from the defendant's apartment on January 28, 1968. That West gave the F.B.I. the information which led to the arrest of the appellant.

The trial court denied the motion on the ground that the jury should be allowed to consider "Mrs. Adkinson's identification at the line-up, Mrs. Adkinson's identification of the defendant in the courtroom, as being the person who was at her teller's cage * * *." This overlooked, of course, the serious deficiency that Mrs. Adkinson never at any time, when she saw the pictures, when she saw the defendant in the line-up, or when she saw the defendant in the courtroom, ever identified him as the man who robbed her. Several times she repeated that she would not be positive about that. She would go only so far as to say that in some respects the defendant "was similar to the robber." The Court also took into consideration the description of the clothing found in the apartment of the defendant and their similarity to some of the items worn by one of the robbers.

The motion for a directed verdict was denied. It was not renewed at the close of all the evidence. After the verdict, however, there was a motion for judgment of acquittal notwithstanding the verdict, and for a new trial, on the grounds formerly raised. This, too, was denied.

■■■ We do not have to look extensively for the law applicable to this situation. On January 8 of this year a panel of this Court [Judges Tuttle, Wisdom, and Bell] decided United States v. Hicks, 420 F.2d 814. In that case the conviction was affirmed because it was amply supported by the record and the defense had not requested an instruction properly defining or limiting the purpose of permitting the prosecution to impeach its own witness. The controlling law was enunciated as follows:

"The problem presented by the appellant here arises from the occurrence that is not infrequent, where one defendant enters a plea of guilty and then becomes the star witness for the prosecution. Such witnesses sometimes fail to come up to the government's expectations when they actually take the witness stand. The temptation is then, of course, very great for the prosecutor to attempt to get before the jury any written inculpatory statement previously made by the witness, so that the jury can then really use the inculpatory statement made by him as substantive evidence to prove the guilt of the accused.

"[1–3] Of course, such an extra judicial statement is not admissible as substantive evidence, because it clearly falls afoul the hearsay rule. This court has repeatedly so held. In Young v. United States, 5 Cir., 1938, 97 F.2d 200, 117 A.L.R. 316, this court said:

'The rule in its original and strict form against impeaching one's own witness is discredited everywhere, and it is generally recognized that impeachment may be resorted to where a

witness has surprised the party offering him, by his testimony. * * * It is fundamental, we think, that the party offering the witness be really surprised at his testimony. Further, it is equally fundamental that the impeaching testimony be admitted not for the purpose of supplying what the witness was expected to, but did not, say, as a basis for a verdict, but only to eliminate from the jury's minds any positive adverse effect which might have been created by the testimony which has surprised the offerer.' "

■ To begin with, the record now before us demonstrates that the prosecution was not surprised by West's testimony. Surprise was negated in at least four unanswerable particulars: (1) West had attempted to hang himself in an effort to avoid testifying; (2) he had left a written statement repudiating his former allegations; (3) he had refused to take the witness stand until he could consult with his lawyer in an effort to avoid prosecution for perjury, and (4) the prosecutor announced to the court before any questions were propounded that the witness was hostile and that he would be impeached.

■ The really crucial point is that the impeaching testimony of Agent Hensel could not be used as substantive proof of an admission by Johnson, to West, that he robbed the bank, United States v. Hicks, supra, 420 F.2d at 815.

The result is that proof of guilt beyond a reasonable doubt is made to depend upon the testimony of Mrs. Adkinson plus the discovery of a pistol, a pair of shoes, and be-bop hat in the appellant's apartment, two months after the robbery. Mrs. Adkinson repeatedly declined affirmatively to identify Johnson as the culprit. None of the others in the bank at the commission of the offense identified him. Mrs. Adkinson repeatedly said that she saw only the muzzle of the pistol and could not identify it beyond "being similar." She said the shoes and the be-bop hat resembled those worn by the robber but she could go no further than

that. The ownership of shoes and hats is not ordinarily susceptible to identification by observation only. Experience teaches that thousands of such articles look exactly alike in outward appearance and are worn by numerous individuals, not just one alone. In Dyer Act cases for the interstate transportation of stolen automobiles this Court has uniformly rejected vehicular identification based solely upon similarity of make, model, or color, Watkins v. United States, 5 Cir., 1969, 409 F.2d 1382.

■ Questions of identification are, of course, ordinarily for the determination of the jury. If, however, as in this case, the sole witness is *unsure* and there are no other connecting or corroborating facts or circumstances the jury is left without evidence upon which to translate unrelieved uncertainty into belief from the evidence beyond a reasonable doubt.

We must point out that we do not have here a case in which hats or shoes carry some special mark or unusual difference, setting them apart from the hundreds of others of exactly the same kind. See, for example, the case of the "out of style, gray, porkpie, flat top hat," worn by a man who was positively identified as a robber by two witnesses, United States v. Reed, 7 Cir., 1968, 392 F.2d 865. See, also, the case in which a merchandise tag left on the floor after a robbery led to the identification of two suits, United States v. Alloway, 6 Cir., 1968, 397 F.2d 105.

The long and the short of this case is that if West had testified to Johnson's alleged admission there would have been a case for submission to the jury. His adamant refusal to do so pulled the linch pin. The remaining evidence was clearly insufficient to meet the required burden of proof.

Appellant raises other points, but in view of the foregoing they need not be discussed.

The judgment of conviction is reversed and, upon remand, the indictment will be dismissed.

Reversed.